Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>JOSÉ CARLOS APONTE RAMOS<br><br>Apelante | KLAN202400186 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Carolina<br><br>Caso Núm.:<br>F VI2021G0007 AL 0011;<br>F LA2021G0055 AL 0060<br><br>Por:<br>Art. 93(a) C.P. (1er. grado) (2012) 4 cargos; Art. 93(a) Tent. C.P. (grave) (2012); Art. 6.05 Ley 168 (grave) (2019); Art. 6.14 (a) (2019) 5 cargos |
| EL PUEBLO DE PUERTO RICO<br><br>Peticionario<br><br>v.<br><br>JOSÉ CARLOS APONTE RAMOS<br><br>Recurrido | KLCE202400350 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de Carolina<br><br>Caso Núm.:<br>F VI2021G0007 AL 0011;<br>F LA2021G0055 AL 0060<br><br>Por:<br>Art. 93 (a) CP (1er grado) 4 cargos; Tent. Art. 93 (a) CP (1er grado); Art. 6.05 LA; Art. 6.14 LA |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Marrero Guerrero.

Sánchez Ramos, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 24 de febrero de 2025.

---

[1] El recurso fue asignado a este panel por virtud de lo dispuesto en la Orden Administrativa OAJP-2021-086, de 4 de noviembre de 2021, sobre *Normas para la Asignación de Recursos Nuevos Previamente Presentados en el Tribunal de Apelaciones*. Como consecuencia de la referida orden, este recurso, así como todo recurso futuro que surja del caso de referencia, pendiente ante el Tribunal de Primera Instancia, será atendido por los integrantes de este panel, quienes adjudicaron los correspondientes recursos anteriores (KLCE202301069); véase, además, Orden Administrativa OATA-2023-032 de 27 de febrero de 2023.

Número Identificador
SEN2025_____

Culminada la celebración de un juicio por jurado, el apelante fue hallado culpable por los delitos de asesinato en primer grado (4 cargos), tentativa de asesinato (1 cargo) y varias infracciones a la Ley de Armas. Según se explica en detalle a continuación, hemos concluido que procede confirmar la sentencia apelada. No obstante, expedimos el auto de *certiorari* solicitado por el Ministerio Público, pues el Tribunal de Primera Instancia ("TPI") cometió un claro error de derecho al imponer al apelante una sentencia menor a la mínima dispuesta por ley.

I.

Por hechos acontecidos el 1 de enero de 2020, el Ministerio Público presentó varias denuncias en contra del Sr. José Carlos Aponte Ramos (el "Apelante" o "Imputado") por infracción al Artículo 93(a) del Código Penal de 2012, Ley Núm. 146-2012, 33 LPRA sec. 5142 (asesinato en primer grado; cuatro cargos y otro por tentativa), y por infracción a los Artículos 6.05 (portación, uso o transporte de arma de fuego sin licencia) y 6.14(a) (disparar o apuntar armas, cinco cargos) de la Ley de Armas de 2020, 25 LPRA secs. 466d y 466m, respectivamente.

En esencia, se le imputó al Apelante causarle la muerte, mediante múltiples disparos, a cuatro personas: el Sr. Edwin Ramos Monge, la Sa. Dorothy Wickline Cruz, quienes estaban casados, y a los hijos gemelos de la pareja, quienes entonces contaban con nueve (9) años de edad (en conjunto, las "Víctimas"). Se le imputó, además, haber intentado causarle la muerte a otro de los hijos de la pareja, quien contaba con quince (15) años de edad, el joven Alex Ramos Wickline ("Alex" o el "Hijo").

Luego de celebrado un primer juicio, el TPI disolvió el jurado al no rendir un veredicto unánime. Subsecuentemente, el Ministerio Público solicitó un nuevo juicio en contra del Apelante.

De conformidad, se celebró un segundo juicio por jurado los días 15, 16, 20, 21 y 22 de junio; 12, 13, 19, 20, 22, 27 y 28 de septiembre; 3, 4, 24, 25, 26 y 27 de octubre de 2023. Además de la prueba documental desfilada, los siguientes testigos declararon en el juicio: Agte. Mayra Figueroa Díaz; Sra. Ana Giselle Doble Ruiz; Sra. María Isabel Cruz Hernández; Sra. María Elena Monge Resto; Sra. Tanya Miliza Hernández Mojica; Sr. William Lugo Rodriguez; Sgto. Orlando Torres Soto; Sr. Alvin Ramos Matos; Sra. Carmen S. Suliveras Ortiz; Sra. Evelyn Medina Conde; Dr. Edwin Betancourt Ortiz; Sr. Abdiel Ramírez Negrón; Dra. Rosa Manan Rodríguez Castillo; Agte. Héctor R. Quiñones Pizarro; y Alex (el Hijo), testigo presencial de los hechos y único sobreviviente.

En atención a las controversias planteadas por el Apelante en el recurso de referencia, nos limitaremos a exponer el testimonio de Alex y aquellas porciones de lo declarado por los otros testigos que resultan pertinentes a la luz de lo que arguye el Apelante.

El Hijo declaró que tenía quince (15) años al momento de los hechos y vivía con sus padres, Dorothy y Edwin, sus hermanos gemelos de nueve (9) años de edad, Erik y Jorge, y su hermano John Paul. Su otro hermano mayor, Luis E. Ramos Wickline no vivía con la familia.[2]

Relató que, el 31 de diciembre de 2019, despidió el año con su familia en la casa de una tía, ubicada en la Urb. El Conquistador del Municipio de Trujillo Alto.[3] Además de la pareja de su tía, sus primos y algunos vecinos de su tía, estaba allí su abuela materna, María.[4] Luego de despedir el año, se quedaron en el lugar hasta que a su mamá le dio sueño y le dijo a él y a sus hermanos que se iban.[5] Tardaron como quince (15) minutos en llegar a su casa. Declaró que

---

[2] Transcripción de la prueba oral (TPO), págs 865-867.
[3] TPO, de la pág. 868, línea 1 a la pág. 869, línea 5.
[4] TPO, de la pág. 869 línea 27 a la pág. 870, línea 33.
[5] Íd., líneas 46-51 y pág. 83, líneas 1-3.

se fue a su cuarto a usar su celular, puso "un estado de WhatsApp" y después miraba Instagram.[6] Entonces, su prima Leimary le envió unas caritas sonrientes.[7] Luego, su hermano John Paul tomó el carro de su mamá prestado para llevar a su novia a su residencia.[8] Entonces, se quedaron en la casa, su mamá, su papá, sus hermanos gemelos y él.[9]

Alex declaró que escuchó una voz de un hombre gritando afuera. Se escuchaba alto.[10] Salió de su cuarto, caminó hacia la puerta y escuchó a Jorge decir "por favor".[11] A preguntas del Ministerio Público, el testigo aseveró **que reconoció la voz que escuchaba afuera. Declaró que era la voz de Carlos, el Imputado.**[12] **Declaró que lo conocía de toda la vida porque iba a su casa a jugar con el hijo de este**.[13] Expresó que Carlos vive cerca de la casa de su abuela en el mismo barrio y que para llegar a su casa "siempre hay que pasar por frente a la casa de Carlos".[14] Añadió que el Imputado vivía con su esposa y sus dos hijos, Carlitos y Adriana.[15] **Declaró que iba a la casa de Carlos a jugar "PlayStation" con Carlitos y con bastante frecuencia veía al Imputado allí**.[16] **Explicó que fue muchas veces a casa de Carlos y que, además de jugar, le ayudaba a darle comida y agua a los gallos.**[17]

En cuanto al momento de los hechos, indicó que su hermano Jorge decía "Carlos por favor no".[18] Le decía a Carlos que no lo hiciera gritando.[19] Jorge estaba afuera de la casa, mientras él

---

[6] TPO, pág. 877, líneas 5-45.
[7] Íd., líneas 45-46.
[8] TPO, pág. 878, líneas 12-41.
[9] TPO, pág. 878, líneas 49-50 y pág. 879, líneas 1-2.
[10] TPO, pág. 879, líneas 3-14.
[11] Íd., líneas 20-24.
[12] TPO, pág. 880, líneas 44-52.
[13] TPO, pag. 881, líneas 2-10.
[14] Íd., líneas 12-52.
[15] TPO, pág. 882, líneas 36-38.
[16] Íd., de la línea 44 a la pág. 883, línea 25.
[17] TPO, pág. 883, líneas 42-51 y pág. 884, líneas 3-4.
[18] TPO, pág. 885, línea 6.
[19] Íd., líneas 10-24.

caminaba desde su cuarto hacia la puerta.[20] Al llegar a la puerta se asomó y observó hacia afuera. Describió que, su "[p]apá estaba afuera, Carlos estaba al lao' (sic) del carro azul. Eh, mi [m]amá estaba frente [a] la puerta, perdón, al lado de la puerta".[21] Expresó que, afuera, había dos carros, uno azul de su hermano Luis y otro blanco de su hermano John Paul, más una guagua blanca "con cajón" de Carlos.[22] Explicó que reconoció que la guagua era de Carlos porque la había visto antes en varias ocasiones.[23] Además, afirmo que la guagua de Carlos estaba ubicada "de frente hacia el final de la carretera".[24]

Cuando llegó a la puerta, Alex dijo que comenzaron los disparos.[25] Describió que Carlos "estaba frente al carro, tenía pantalón largo, camisa de manga larga", "tenía barba [...] con mucho pelo" y "tenía gorra".[26] En cuanto a la iluminación del lugar, explicó que dentro de la casa estaban encendidas la luz del baño y la del cuarto de su mamá y contaban además con "la luz del poste de afuera".[27] Declaró que Carlos se encontraba frente a su papá y su mamá y que comenzó a disparar "hacia nosotros" "con una pistola", descrita corno pequeña y de color negra.[28]

Narró que cuando comenzaron los disparos sintió "un calambre en la pierna", se cayó y se arrastró hacia la cocina, hacía unos gabinetes, mientras continuaba escuchando muchos disparos.[29] Cuando estaba en la cocina, observó a Jorge correr hacia el cuarto de su mamá y a Eric entrar hacia la cocina, "caminando de espalda, escupiendo sangre".[30] Observó a su mamá

---

[20] Íd., líneas 30-38.
[21] TPO, pág. 886, líneas 7-10.
[22] TPO, pág. 886, líneas 18-52.
[23] TPO, pág. 887, líneas 2-9.
[24] Íd., líneas 17-24.
[25] Íd., líneas 31-36.
[26] TPO, pág. 887, líneas 38-52 y pág. 888, líneas 1-10.
[27] TPO, pág. 888, líneas 20-29.
[28] Íd., líneas 38-51 y pág. 889, línea 1.
[29] TPO, pág. 889, líneas 12-41.
[30] TPO, pág. 890, líneas 22-51 y pág. 891, líneas 1-4.

caer al piso entre la puerta y la nevera de la cocina. Luego vio a Carlos entrar hacia el cuarto y dispararle a Jorge.[31] Declaró que vio a Carlos "porque hay que pasar por la cocina pa' poder llegar al cuarto".[32] Explicó que cuando Carlos iba a salir de la casa, lo vio en la cocina, mientras le decía que por favor no lo hiciera "por favor, Carlos no".[33] Carlos le disparó nuevamente mientras Alex estaba en el piso. Al levantar Alex su mano derecha, el disparo lo hirió en la mano y la cara, específicamente en la boca.[34] **Nuevamente declaró que vio a Carlos con mucha barba y que tenía certeza de que era Carlos porque le vio la cara y "ya lo conocía"**.[35] Perdió cuatro dientes y hueso de la cara debido al disparo.[36]

Alex relató que quedó entre consciente e inconsciente, abrió los ojos cuando Carlos ya no estaba y logró caminar hasta su cuarto y buscar su celular.[37] Luego se sentó en la sala y limpió la pantalla de su celular ensangrentada con una sábana que encontró allí.[38] Pudo entonces desbloquear su celular y le envió un mensaje a su prima Leimary, hija de su tía Rosa, para que llamara a la Policía.[39] La prima le contestó si su mensaje era "en serio" y entonces el testigo indicó que le envió un mensaje de voz.[40] Declaró que se quedó en el piso en el área del comedor y al rato llego su abuela materna, María, su tía y sus dos primos mayores.[41] Aseveró que reconoció las voces de su abuela, su tía, sus primos y la pareja de su tía.[42]

Reveló que, mientras su abuela materna gritaba, su tía comenzó a llamarlo y él intentaba pedir ayuda como le salían las

---

[31] TPO, pág. 891, líneas 8-11.
[32] Íd., líneas 21-22.
[33] TPO, pág. 892, líneas 5-7, 11-12 y 35-41.
[34] TPO, pág. 892, líneas 29-45 y pág. 893, líneas 1-8, 43-51.
[35] TPO, pág. 893, líneas 23-34.
[36] TPO, pág. 894, líneas 1-9.
[37] TPO, pág. 894, líneas 24-25 y pág. 895, líneas 6-10.
[38] TPO, pág. 896, líneas 13-34.
[39] Íd., líneas 36-51.
[40] TPO, pág. 897, líneas 9-29.
[41] TPO, pág. 898, líneas 16-21 y pág. 899, líneas 1-20.
[42] TPO, pág. 899, líneas 36-50.

palabras.[43]  Alex dijo que su tía intentaba tranquilizar a su abuela para pedirle la dirección, y que después llegó una ambulancia y pidieron ayuda para montarlo en la camilla.[44]  Recordó la persona que llegó en la ambulancia era una mujer.  Explicó que, entre sus primos, la pareja de su abuela y la mujer que llegó en la ambulancia, lo subieron a la camilla para entonces montarlo en la ambulancia.[45]  Una vez en la ambulancia le preguntaron por sus heridas y el testigo señaló su cara, la pierna y la mano.[46]  Añadió que la mujer de la ambulancia le dijo que no hablara porque él intentó "decirle que, quién era el que lo había hecho", "para que pagara por lo que hizo".  Expuso que quería decirle que Carlos había "asesina[do] a mi familia".[47]

Aunque no recuerda que ocurrió durante el trayecto en la ambulancia, Alex dijo que lo llevaron a Centro Médico donde fue atendido por el personal médico.[48]  Añadió que había un agente de la Policía apodado "Chino" y que le mencionó el nombre de Carlos a dicho agente.[49]  Mientras estaba hospitalizado, el día 3 o 4 de enero de 2020, habló con el agente Quiñones y los fiscales asignados al caso.[50]  Explicó que tenía un alambre de lado a lado en la boca que no le permitía hablar muy alto y, aunque la entrevista fue corta, pudo decir "quién había sido" el autor de los hechos.[51]

En específico, relató que le dijo al agente Quiñones que Carlos "vivía cerca de mi abuela" y que él lo conocía porque "iba a jugar con su hijo".[52]  Añadió que, el 6 de enero de 2020, le tomaron una declaración jurada en la que **reiteró que Carlos fue quien disparó**

---

[43] TPO, pág. 900, líneas 9-20.
[44] Íd., líneas 25-28 y pág. 901 20-21.
[45] TPO, pág. 901, líneas 20-39.
[46] TPO, pág. 902, líneas 9-19.
[47] Íd, líneas 24-30 y 44-51.
[48] TPO, pág. 903, líneas 1-25.
[49] Íd, línea 50 y pág. 904, líneas 1-39 y pág. 905, líneas 5-10.
[50] TPO, pág. 906, líneas 26-50 y pág. 907, líneas 1-7.
[51] TPO, pág. 907, líneas 15-30 y pág. 908, líneas 17-28.
[52] TPO, pág. 910, líneas 15-30.

**y mató a su familia**.[53]          **Subsecuentemente, identificó al Imputado en corte abierta, a quien identificó como Carlos**.[54]

Enfatizó que estaba cien por ciento seguro de que Carlos había cometido los hechos porque él lo conocía.[55]  Comparado con el día de los hechos, Alex indico que el Imputado estaba más flaco y sin barba.[56]  Explicó que sabía que Carlos tenía un tatuaje en el brazo pero que al momento de los hechos no lo vio porque usaba una camisa de manga larga.  Al igual que en el juicio, en ese momento usaba ropa de manga larga.[57]

El Ministerio Público le mostró varias fotografías a Alex.  Alex identificó la casa donde vivió toda su vida, el cuarto de sus hermanos pequeños, el cuarto de sus padres, el baño, el área donde envió los mensajes y la sabana con su propia sangre.[58]  En relación a su casa, explicó que la casa de Carlos quedaba más hacia la izquierda, lejos.[59]  Continuó la identificación de las áreas de la casa en las fotos.  Luego identificó el lugar hacia donde se arrastró y donde Carlos le disparó nuevamente en la mano y la cara.[60]  Expresó que, cuando Carlos le disparó en la mano y la cara, estaba sentado al lado del gabinete cerca del identificador núm. 23 en la foto que le mostraron.[61]

Alex explicó que, cuando Carlos le disparó, quedó "arrecostao" (sic) del gabinete y que la sangre que se veía en la foto que le mostraron entre los núms identificadores 23 y 24 era suya.  En cuanto a los autos que se observaban en una foto del frente de su casa, declaró que estaban dañados.[62]  Detalló que, cuando se asomó a la puerta de su casa la madrugada de los hechos, vio a Carlos al

---

[53] TPO, pág. 911, líneas 11-14 y pág. 915, líneas 2-7.
[54] TPO, pág. 916, líneas 28-36, pág. 917, líneas 7-9 y pág. 36-47.
[55] TPO, pág. 917, líneas 11-19.
[56] Íd., líneas 21-30 y pág. 918, líneas 45-47.
[57] TPO, pág. 919, líneas 19-52.
[58] TPO, págs. 920-922.
[59] TPO, pág. 922, líneas 42-48 y pág. 923, líneas 1-6.
[60] TPO, pág. 924, líneas 22-36 y pág. 925, líneas 8-30.
[61] TPO, pág. 925, líneas 30-44.
[62] TPO, pág. 926, líneas 23-44.

lado de la puerta trasera del carro azul.[63]  Añadió que Carlos tenía el arma de fuego en la mano derecha.[64]

**Resaltamos que el testigo, aunque identificó como Carlos al Apelante, sabía que su nombre completo era José Carlos.  Y que Carlos y José Carlos es la misma persona**.[65]  Al mostrarle otra foto, admitida como Exhibit 1L, Alex identificó su casa y dijo que el poste de alumbrado eléctrico que se ve en la foto alumbraba hacia su casa.[66] Luego se le mostró otra foto, Exhibit 1R, en el que identificó su cuarto, el televisor y la cama manchada con su sangre.[67]

Continuados los procedimientos, a preguntas del Ministerio Público, Alex insistió en que, cuando buscó su teléfono y se sentó en la sala, se comunicó con su prima Leimary para avisarle lo que había pasado.[68]  Explicó que un mensaje fue escrito y el otro hablado.[69]  Entonces, al mostrarle el Exhibit 12A, identificó su voz. Indicó que en el mensaje le dijo a su prima que estaba herido y que acababan de "entrarle a tiros".[70]

En el contrainterrogatorio, Alex admitió que no recordaba que había prestado una segunda declaración jurada el 10 de febrero de 2020.[71]  Reconoció que no recordaba uno de los apellidos del Imputado, sabía que uno de los apellidos era Ramos.[72]  Aceptó que no sabía el nombre de la esposa del Imputado y reiteró que había ido a casa de Carlos muchas veces.[73]  Añadió que su papá trabajó para el Apelante.[74]  Indicó que desconocía que su hermano mayor (Luis Ramos Wickline) tuvo un atentado en su contra el 30 de

---

[63] TPO, pág. 927, líneas 10-15 y 46-50.
[64] TPO, pág. 928, líneas 1-5.
[65] TPO, pág. 927, líneas 26-44.
[66] TPO, pág. 928, líneas 7-31.
[67] TPO, pág. 929, líneas 15-33.
[68] TPO, pág. 952, líneas 31-46 y pág. 953, líneas 2-4.
[69] TPO, pág. 953, línea 10.
[70] TPO, pág. 953, líneas 29-34, pág. 954, líneas 21-28 y pág. 957, líneas 16-19.
[71] TPO, pág. 967, líneas 18-28.
[72] TPO, pág. 971, líneas 45-49 y pág. 972, líneas 3-6.
[73] TPO, pág. 972, líneas 19-39 y pág. 973, línea 7.
[74] TPO, pág. 977, líneas 17-21.

diciembre de 2019.[75] Admitió que Carlos no se encontraba en la despedida del año en casa de su tía y que no sabía dónde este despidió el año.[76] Además, reconoció que ingirió bebidas alcohólicas durante la fiesta de despedida de año.[77] Al mostrarle el Exhibit 12D del Ministerio Público por estipulación, reconoció que era una captura de pantalla de la conversación que tuvo por WhatsApp el 1 de enero de 2020 con su prima Leimary.[78] Expresó que el estado leía "estuvo buena la borrachera", pero no lo recordaba.[79] Luego de que la prima le contestara con caritas felices a las 2:37 am, Alex también ripostó con caritas felices a las 2:38 am.[80] A las 2:40 am, Alex le escribió a su prima "llama a la Policía", y esta le respondió con una interrogante a las 2:41 am, y él le contestó "hazlo".[81] Luego, Alex le envió el mensaje de voz.[82] En ese momento, admitió que no le dijo a su prima que fue Carlos el autos de los hechos.[83]

En cuanto a la descripción del Imputado en la declaración jurada del 6 de enero de 2020, admitió que describió a Carlos como más blanco que él, de pelo negro, mucho pelo, barba negra con mucho pelo, más alto que él, ni gordo ni flaco, "es un poco fuertecito" y tiene tatuaje en uno de sus brazos.[84] Además, insistió en que, al momento de los hechos, dentro de su casa estaban prendidas la luz del baño y la luz del cuarto de sus padres.[85] Reconoció que, en ocasión de la declaración jurada, no indicó que quería hablar en la ambulancia para decir quién cometió los hechos.[86] También aceptó

---

[75] TPO, pág. 981, líneas 17-22.
[76] TPO, pág. 989, líneas 22-28 y 35-51.
[77] TPO, pág. 990, líneas 12-18.
[78] TPO, pág. 991, líneas 8-46.
[79] Íd., líneas 39-50 y pág. 992, línea 1.
[80] TPO, pág. 992, líneas 31-34.
[81] Íd., líneas 38-52.
[82] TPO, pág. 993, líneas 1-6.
[83] Íd., líneas 7-17.
[84] TPO, pág. 1002, líneas 32-51 y pág. 1003, líneas 1-11.
[85] TPO, págs. 1021 líneas 46-51 y pág. 1022, línea 1.
[86] TPO, pág. 1026, líneas 29-35.

que no le indicó a sus familiares, cuando llegaron a su casa despúes de los hechos, que Carlos era el responsable de los mismos.[87]

En el redirecto, aunque no recuerda el contenido de lo que gritaba Carlos fuera de su casa al momento de los hechos, **Alex insistió que era Carlos quien gritaba**. Explicó que reconoció su voz porque ya "lo había escuchado hablar antes y había hablado con él también".[88] Expresó que, al enviarle el mensaje de audio a su prima, no le indicó quién cometió los hechos porque necesitaba ayuda y le escribió para eso.[89] En cuanto a las bebidas alcohólicas que consumió el 31 de diciembre de 2019, dijo que se bebió tres o cuatro cervezas, antes de la medianoche, que luego comió y que tenía permiso de su mamá.[90] Alegó que, cuando subió el estado de WhatsApp, estaba en su casa y que, en cuanto a la bebida, se sentía bien.[91] En relación al tiempo que tuvo para ver a Carlos al momento de los hechos, **Alex explicó que, aunque no lo vio por mucho tiempo, fue suficiente para reconocerlo.[92] Además de verlo cuando le disparó en la puerta, Alex dijo que lo vio luego cuando se le acercó y le disparó nuevamente**.[93] **Insistió en que no tenía dudas de que la persona que le disparo a su familia y a él era el Imputado.**[94]

En el re-contrainterrogatorio, Alex declaró que José Carlos y Carlos son la misma persona. Sin embargo, en todas las declaraciones, lo llamó Carlos porque así es como lo conoce.[95] Señaló que no conocía de alguna razón que Carlos tuviera para dispararle.[96] Admitió que no recordaba si los tatuajes de Carlos eran

---

[87] Íd., líneas 37-42, 50-51, y pág. 1027, líneas 1-16.
[88] TPO, pág. 1046, líneas 1-37.
[89] TPO, pág. 1047, líneas 51-52 y pág. 1048, líneas 1-4.
[90] TPO, pág. 1054, líneas 23-50, pág. 1055, 1-11 y pág. 1056, línea 14.
[91] TPO, pág. 1055, líneas 20-35.
[92] TPO, pág. 1060, líneas 42-43.
[93] Íd., líneas 45-50.
[94] TPO, pág. 1061, líneas 5-10 y 21-37.
[95] TPO, pág. 1065, líneas 41-42.
[96] TPO, pág. 1068, líneas 48-52.

grandes o pequeños.[97]  Declaró que, a las 2:38 am, le respondió el mensaje a su prima y luego, a las dos y cuarenta, le escribió a su prima que llamara a la Policía; en ese momento afirmó que Carlos ya no estaba en la casa.[98]

La versión de los hechos y la identificación que hizo Alex fueron corroboradas por varios de los testigos presentados por el Ministerio Público.  La Sa. Ana G. Doble Ruiz (señora Doble Ruiz) declaró que es ama de casa y que el día de los hechos se encontraba en las parcelas de Carraizo en Trujillo Alto para despedir el año en casa de su suegra.[99]  Luego de despedir el año, apareció en casa de su suegra María, a quien describió con relación a los fallecidos como mamá y abuela de Dorothy, Erick, Jorge y suegra de Edwin.[100] Añadió que María es como la madre de crianza de su esposo y que Dorothy era la mejor amiga de su esposo.[101]

Explicó que, entre las tres (3) y cuatro (4) de la madrugada, María recibió una llamada de otra hija quien le indicó que algo le había sucedido a Dorothy.  María se despide para ir a casa de Dorothy y el esposo de la señora Doble Ruiz dijo que le avisara cualquier cosa.  La señora Doble Ruiz explicó que estaban en el mismo barrio e indicó que no habían pasado cinco (5) minutos cuando María llamó a su esposo.[102]  Relató que escuchó a María gritar, pedir ayuda y decir que "estaban todos muertos" y que no sabía que hacer.[103]  La señora Doble Ruiz declaró que se montó en el carro para acompañar a su esposo y llegaron a la residencia de Dorothy.[104]

---

[97] TPO, pág. 1069, líneas 50-51, pág. 1070, líneas 1-4.
[98] TPO, págs 1079, líneas 35-51 y pág. 1080, líneas 1-4.
[99] TPO, pág. 54, línea 31 a la pág. 55, línea 5.
[100] TPO, pág. 55, líneas 5-15.
[101] Íd., líneas 19-24.
[102] Íd., líneas 34-46.
[103] Íd., líneas 46-49.
[104] Íd., líneas 49-51.

Mientras su esposo abrazaba a María y esta gritaba que estaban todos muertos, la señora Doble Ruiz declaró que bajó hacía la casa y encontró a Edwin en la puerta, en el balcón de la residencia.[105] Explicó que lo encontró sentado y sin signos vitales y que había mucha sangre.[106] Aclaró que estudió forenses y tiene un curso de primeros auxilios y resucitación cardiovascular ("CPR").[107] Luego observó a Dorothy que trataba de tocarse la bata, luego verificó los gemelos, ya fallecidos, y finalmente a Alex quien pedía ayuda.[108] Alex se encontraba en el suelo en un área abierta de la casa[109], al lado de la cocina.[110] La señora Doble Ruiz relató que comenzó a hacerle presión en la boca a Alex cuando llegó una ambulancia y gritó que tenía una persona con vida.[111] Una de las paramédicos se quedó fuera de la residencia, mientras la otra verificó los signos vitales de las víctimas e hizo preguntas en torno a los nombres, edades y conocimiento personal de estos. Entre ambas, trataron de levantar a Alex para colocarlo en una camilla, pero necesitaron ayuda del esposo de la señora Doble Ruiz y del tío de los menores perjudicados.[112] Aseveró que Dorothy falleció cuando ella mencionó que Alex estaba vivo.[113] En cuanto a la iluminación, la testigo declaró que estaba encendida la luz del cuarto donde yacía uno de los gemelos, el balcón tenía luz y había un poste con luz.[114]

Por su parte, la Sa. María Isabel Cruz Hernández (señora Cruz Hernández) relató que tuvo tres hijos: Jannie Wickline Cruz, Dorothy Wickline Cruz y Rosa Guzmán Cruz. Dorothy vivía en las

---

[105] TPO, pág. 56, líneas 44-47 y pág. 57, líneas 16-21.
[106] TPO, pág. 57, líneas 25-28.
[107] TPO, pág. 58, líneas 23-27.
[108] Íd., líneas 29-47 y pág. 61, líneas 4-12.
[109] Íd., líneas 51-52.
[110] TPO, pág. 59, líneas 1-2.
[111] Íd., líneas 17-28.
[112] TPO, págs. 60- 62.
[113] TPO, pág. 63, líneas 1-7.
[114] Íd., líneas 41-43.

parcelas Los Ramos con su esposo Edwin Ramos.[115]  Detalló que Edwin y Dorothy tuvieron cinco (5) hijos: Luis, John Paul, Alex, Jorge y Erick todos de apellidos Ramos Wickline.  A la fecha de los hechos, los gemelos Jorge y Erick tenían nueve (9) años.[116]

Relató que, para despedir el año, primero visitó con su esposo al hijo de este, quien acababa de salir del hospital.  Luego la familia se reúne en casa de su hija Rosa.[117]  Dorothy salió a buscar a su hijo John Paul y la novia de este.[118]  Luego de despedir el año y comer, Dorothy se despide de la señora Cruz Hernández.[119]  La señora Cruz Hernández se quedó para despedirse de su hija Rosa. Subsecuentemente, se despidió de todos y se fue con su esposo a su casa.[120]  De camino a su residencia, se detuvo en casa de su amiga Isabel a felicitar a los vecinos.[121]

La señora Cruz Hernández identificó a uno de los asistentes como Elmer, hijo de Isabel, y la esposa de este, Ana (señora Doble Ruiz).[122]  Después de las tres (3) de la mañana, fue a buscar su teléfono celular a su guagua para enseñar la foto de su nieto.  Al ver su teléfono se percata de que tiene llamadas perdidas de su hija Rosa.[123]  Al hablar con Rosa, se sintió preocupada, le pidió las llaves del auto a su esposo y se marcharon juntos.[124]  Subsiguientemente, llegó a la casa de su hija, Dorothy Wickline.[125]  Desde su guagua llamó varias veces a su hija y veía a Edwin en el balcón, recostado de la pared.[126]  En cuanto a la visibilidad, aunque era de noche "se

---

[115] TPO, pág. 100, líneas 46-50 y pág. 102, líneas 1-27.
[116] TPO pág. 103, líneas 6-17.
[117] TPO, pág. 106 líneas 12-49.
[118] TPO, pág. 107 líneas 28-30.
[119] TPO, pág. 112, líneas 22-24.
[120] TPO, pág. 113, líneas 16-28.
[121] TPO pág. 114, líneas 8-32.
[122] TPO, pág. 114 línea 42 a la pág. 115, línea 20.
[123] TPO, pág. 116, líneas 20-46.
[124] TPO, pág. 117, líneas 49-51 y pág. 118, líneas 1-47.
[125] TPO, pág. 120, líneas 1-33.
[126] TPO, pág. 124, líneas 2-42.

veía".[127]  Al acercarse a la casa, escuchó una voz de adentro de la casa que decía "abuela, abuela ayuda".[128]

La señora Cruz Hernandez se acercó al balcón en donde yacía Edwin, luego entró hasta la sala en donde vio a su hija y los hijos de esta, Erick, Jorge y Alex, en el suelo.[129]  Su esposo la sujetó con fuerza, la sacó de la residencia y no la dejó entrar nuevamente.[130] Su esposo la mantuvo agarrada y la llevó hasta la guagua porque ella quería buscar a su hija, aún con vida, y al "nene" y llevarlos a un hospital.[131]  Cuando llegó la ambulancia, no la dejaron entrar y vio cuando sacaron a Alex en una camilla.[132]  Luego fue a su casa a buscar un *sweater* para ir al Centro Médico.[133]

Regresó a la escena de los hechos para identificar a sus familiares fallecidos.  Cuando llegó, ya su nieto John Paul había identificado a los difuntos.[134]  En cuanto a Ana, esposa de Elmer, indicó que estos llegaron al lugar de los hechos después de recibir una llamada telefónica que hizo una amiga que acompañaba a Rosa en el lugar.  Declaró que Ana tiene conocimientos médicos y ayudó a Alex.  Luego Ana se disculpó porque no pudo salvar a Dorothy.[135]

Por su parte, la Sa. María E. Monge Resto (señora Monge Resto) informó que reside en el sector Los Ramos con su esposo de 54 años, Pedro Ramos y que procrearon tres (3) hijos: Edwin, Pedro e Iván, todos de apellidos Ramos Monge.[136]  Edwin era su hijo mayor.[137]  Expresó que conoce al Imputado desde que este nació y fue a vivir al mismo lugar donde ella reside, el sector Los Ramos en Carraizo Alto.[138] **Declaró que lo conoce por el nombre de Carlos,**

---

[127] TPO, pág. 126, líneas 2-35.
[128] Íd., línea 46-51.
[129] TPO, págs. 127-128.
[130] TPO, pág. 129, líneas 4-7.
[131] TPO, pág. 130, líneas 8-14.
[132] TPO, pág. 133, líneas 2-34.
[133] TPO, pág. 135, líneas 1-25.
[134] TPO, pág. 135 línea 33 a la pág. 136, línea 8.
[135] TPO, pág. 137, líneas 35-48.
[136] TPO, pág. 175 líneas 19-52 y pág. 176, líneas 2-21.
[137] TPO, pág. 176, línea 23-30.
[138] TPO, pág. 177 líneas 1-37.

**que todo el mundo lo conoce por el nombre de Carlos**.[139] **Luego lo identificó en sala.[140] Informó que el acusado vivía con su esposa e hijos, cerca de su residencia**.[141]

El día de los hechos, 31 de diciembre de 2019, estaba en su casa con su esposo y se acostó a dormir temprano como a las 8:00 pm porque no despide el año.[142] Al día siguiente, se levantó temprano a las 5:00 am e hizo café. Llegaron sus hijos, Pedro e Iván, con sus respectivas esposas y hablaron con ella.[143] Atendió a su esposo que estaba delicado de salud y subió hasta la casa de su hijo Edwin, donde ocurrieron los hechos, pero no la dejaron entrar.[144]

De otra parte, la Sa. Tanya M. Hernández Mojica (señora Hernández Mojica) declaró que es paramédico y enfermera.[145] Al momento de los hechos trabajaba en el Cuerpo de Emergencias Médicas Estatal de Puerto Rico.[146] Al momento de los hechos investigaba un posible caso de violencia doméstica en Trujillo Alto.[147] Cuando recibe la llamada de alerta, a las 3:19 am, fue al lugar de los hechos con su compañera de turno, Janet Torres, quien conducía la ambulancia.[148] Al acercarse al lugar se da cuenta que los agentes de la Policía no habían llegado. De acuerdo con el protocolo de seguridad, en escenas en donde hay heridos de bala no deben entrar hasta que llegue la Policía.[149] Mientras esperaba por la Policía, se acercó a la ambulancia un hombre "histérico" que pedía ayuda. Le explicaron que por razones de seguridad no podían entrar en la escena y debían esperar por la Policía. Se le suplico que entraran porque había menores en la escena.[150]

---

[139] TPO, pág. 177, líneas 33-37 y pág. 178, línea 14.
[140] TPO, pág. 179, líneas 2-25.
[141] Íd., líneas 27-49.
[142] TPO, pág. 181, líneas 25-51.
[143] TPO, pág. 182, líneas 19-44 y pág. 183, líneas 36-41.
[144] TPO, pág. 183, líneas 47-52 y pág. 184, líneas 2-36.
[145] TPO, pág. 206, línea 31.
[146] TPO, pág. 207, líneas 16-21.
[147] TPO, pág. 208, líneas 21-29.
[148] TPO, pág. 209 líneas 1-27.
[149] TPO, pág. 210, líneas 1-48.
[150] TPO, pág. 211, líneas 1-9.

La testigo decidió entrar y convenció a su compañera para que entraran.[151] Encontró a un hombre semisentado en el balcón de la residencia, luego la mujer con un menor de edad a su lado y otro menor en la entrada de un cuarto. Todos sin signos vitales y las pupilas dilatadas.[152] Luego encontró a un adolescente herido con mucha dificultad respiratoria que le dijo que estaba vivo.[153] Salió de la escena y logró convencer a su compañera de turno que entrara y la ayudara.[154]

Con un "long board", y la ayuda de unos caballeros que estaban fuera de la residencia, lograron acostar al herido en la camilla y meterlo en la ambulancia.[155] En cuanto a la luz disponible en la residencia, dijo que era visible, pero no como si fuera las cinco de la tarde.[156] Mientras estabilizaba al paciente en la ambulancia, lo observó desesperado y quería hablar.[157] **Expreso que el paciente quería hablar con la Policía** y ella le explicó que era paramédico, que la ayudara a salvarle la vida contestando preguntas médicas.[158]

Por otro lado, el Sgto. Orlando Torres Soto (sargento Torres Soto) expresó que, al momento de los hechos, era director de la División de Homicidios del CIC y estaba "on call" en su residencia.[159] Ese día, en horas de la madrugada, recibió una llamada de que había ocurrido una masacre en Trujillo Alto, en el Sector Los Ramos.[160] Se comunicó con el agente que le tocaba atender el asesinato y llamó a todo el personal ante la magnitud del suceso.[161]

Al llegar a la escena, entrevistó a la agente Figueroa Díaz, encargada de custodia la escena del crimen.[162] Describió el lugar

---

[151] TPO, pág. 212, líneas 10-20.
[152] TPO, págs. 213-216.
[153] TPO, pág. 217.
[154] TPO, pág. 218.
[155] TPO pág. 219.
[156] TPO pág. 222, líneas 19-26.
[157] TPO pág. 223, líneas 6-50 y pág. 224, líneas 2-7.
[158] TPO pág. 224, líneas 21-37.
[159] TPO, pág. 307.
[160] TPO, pág. 308, líneas 1-3.
[161] TPO, pág. 309, líneas 20-26.
[162] TPO, pág. 315, líneas 33-44.

como un camino vecinal, una casa pequeña con unos vehículos frente a la residencia.[163] Entrevistó familiares, vecinos e hizo una vista ocular de la escena.[164] Estuvo aproximadamente entre una hora a hora y media en el lugar.[165] Cuando llegó su supervisor, Inspector Carlos Nazario, le informó a este que había un herido. También le comentó que se iba a Centro Médico con el agente Carlos Corchado a verificar la condición del herido.[166] En cuanto a la identidad del herido, refirió que le dieron la información y tenía el nombre, Alex Ramos, y la edad, en ese momento, quince (15) años.[167] Relató que se detuvo a desayunar y llegó a Centro Médico alrededor de las 9:30-9:40 am.[168]

El sargento Torres Soto declaró que a Centro Médico llegó un trabajador social del Departamento de la Familia, el Sr. Alvin Ramos.[169] Al entrar al área de trauma de sala de emergencias, el médico de turno le informó que el herido, Alex Ramos, se encontraba en una camilla sin sedación y con medicamentos para el dolor administrados. Observó al perjudicado con vendajes en el rostro y en una mano.[170] El testigo aseveró que se acercó por un lado de la camilla y el trabajador social por el otro lado.[171] Comenzó a entrevistar a Alex y tomó notas, las cuales reconoció en corte.[172] La entrevista fue de ocho minutos de 9:40-9:48 am.

Subsiguientemente, el sargento Torres Soto narró el relato de los hechos que le hizo el perjudicado. Alex le indicó que la familia despedía el año en casa de una tía: papá, mamá, los hermanitos gemelos y un hermano mayor con su novia. En la madrugada, al regresar a la residencia familiar, el hermano mayor sale a llevar a la

---

[163] TPO, de la pág. 315, línea 50 a la pág. 16, líneas 2.
[164] TPO, pág. 316, líneas 30-47.
[165] TPO, pág. 317, línea 45-46.
[166] TPO, pág. 318, líneas 21-25.
[167] TPO, pág. 319, líneas 14-50.
[168] TPO, pág. 320, líneas 2-34.
[169] TPO, pág. 321, líneas 43-52.
[170] TPO, pág. 313, líneas, 11-31.
[171] Íd., líneas 49-52.
[172] TPO, pág. 324, línea 15 a la pág. 326, línea 8.

novia a su casa.[173]    Mientras sus padres se preparaban para acostarse, Alex se fue a su cuarto a "bregar" con su celular.[174] Entonces escuchó unos disparos y, cuando se asomó hacia la cocina, **observó a Carlos, quien indicó que vivía en una casa como un "castillo", con un arma de fuego disparándole a sus padres y hermanitos.[175]**    A preguntas del Ministerio Público, el sargento Torres Soto indicó que **Alex le dijo que Carlos vivía en el Sector Los Ramos de Trujillo Alto, que había llegado a su casa en una pickup blanca y que lo conocía de toda la vida, desde pequeño, porque trabajaba con su papá**.[176]    Alex le expresó que, una vez observó a Carlos dispararle a su familia, le dispararon y cayó al piso.  Entonces le envió un mensaje por el celular a su prima, de nombre Leimary.[177]    Entonces, Alex comenzó a preguntarle por qué habían matado a sus hermanitos, si eran unos angelitos.  El sargento Torres Soto narró que Alex sentimentalmente se descompuso y por eso le dio "espacio".[178]    Decidió no tomarle más tiempo de los médicos que atenderían a Alex.[179]

Luego de entrevistar a Alex, el sargento Torres Soto se comunicó con los fiscales Jimara Gabriel y Juan Domínguez para informarles el contenido de su entrevista, inclusive la identificación del agresor.[180]    Además, compartió la información con el agente investigador asignado al caso y con su supervisor.[181]    Luego hizo varias gestiones con las cámaras de seguridad y entrevistas con familiares de las víctimas, incluida Leimary, prima de Alex, a quien se llevó al cuartel general de la Policía.[182]

---

[173] TPO, pág. 327, líneas 15-46.
[174] TPO, pág. 328, líneas 7-11.
[175] TPO, pág. 328, líneas 32-50.
[176] TPO, pág. 329, líneas 9-52.
[177] TPO, pág. 330, líneas 8-18.
[178] Íd., líneas 27-45.
[179] Íd., líneas 49-51.
[180] TPO, pág. 331, líneas 18-49.
[181] TPO pág. 332, líneas 28-44.
[182] Íd., líneas 14-25.

El sargento Torres Soto declaró que, algunos tres (3) días después, regresó con el Ministerio Público y el agente investigador a Centro Médico. Ese día, mientras los fiscales y el agente investigador entrevistaban a Alex, quien convalecía en Centro Médico, su función fue prestar seguridad.[183] Explicó que personal del Departamento de la Familia también estaba presente al asumir la custodia de Alex, por tratarse de un menor que perdió sus padres.[184] Además de los fiscales antes mencionados, el sargento Torres Soto identificó al fiscal Rivera Geigel, encargado del Directo en ese momento, como el otro fiscal que participó de la entrevista de Alex.[185]

De otro lado, el Sr. Alvin Ramos Matos (señor Ramos Matos) relató que, al momento de los hechos, llevaba siete (7) años trabajando en el Departamento de la Familia.[186] El caso de autos se le asignó el día de los hechos, 1 de enero de 2020, cuando comenzó su turno a las 6:00 am.[187] Cuando llegó a Centro Médico, después de las 8:00 am, a la Unidad de Cuidado Crítico, había varios agentes de la Policía custodiando a Alex.[188] Su propósito al ir al hospital era auscultar recursos familiares que pudieran hacerse cargo del menor debido a que los padres habían fallecido.[189] Observó a Alex con una herida de bala en la muñeca y en la mejilla que le hizo perder la mitad de los dientes.[190] Explicó que se identificó con el sargento Torres y le indicó el motivo de su visita. El sargento Torres Soto le solicitó autorización para hacerle preguntas al jovencito herido y el testigo lo autorizó. Dijo que las preguntas del sargento Torres Soto iban dirigidas a saber que había ocurrido, cómo fueron los sucesos

---

[183] TPO, de la pág. 334, línea 2 a la pág. 335, línea 2.
[184] TPO, pág. 335, líneas 8-21.
[185] Íd., líneas 41-48.
[186] TPO, pág. 461, líneas 6-14.
[187] Íd., líneas 47-51.
[188] TPO, pág. 462, líneas 28-49.
[189] TPO, pág.463, líneas 16-29.
[190] TPO, p 464, líneas 8-20.

y quién irrumpió en el hogar de las víctimas.[191]  El señor Ramos Matos alegó que el perjudicado dijo que escuchó detonaciones mientras estaba en su cuarto y que, cuando salió, vio una persona de la comunidad que mató a su familia y luego le disparó a él cayendo al piso.[192]  A preguntas del Ministerio Público, el señor Ramos Matos declaró que **Alex dijo que fue un vecino de la comunidad que se llama Carlos**. La entrevista terminó porque el menor comenzó a temblar y se mostró lloroso.[193]  El sargento Torres Soto se retiró del cubículo, mientras el señor Ramos Matos continuó las preguntas en cuanto a nombres de familiares.[194]  Alex le proveyó los nombres y la dirección donde podía conseguir a los abuelos. Luego visitó familiares del menor para saber si alguno podía hacerse cargo del menor.  **En ese momento, el Departamento de la Familia asumió la custodia del menor**.[195]

Durante el re-directo, el señor Ramos Matos explicó que no incluyó el nombre que Alex le indicó era el autor de los hechos debido a que su investigación e informe era uno social y no criminal. No obstante, sí incluyó lo observado por Alex y una descripción breve del autor como "un vecino de la comunidad".[196]  Añadió que él fue quien autorizó al Ministerio Público a entrevistar a Alex para hacer una declaración jurada el 3 de enero de 2020 y el 6 de enero de 2020, mientras convalecía en el Centro Médico.[197]  No estuvo presente en las entrevistas porque estaba ocupado coordinando el hogar de acogida para Alex.

Por otro lado, el Dr. Edwin Betancourt Ortiz (doctor Betancourt Ortiz), trabajaba en sala de emergencias en Centro Médico al momento de los hechos.  Describió a Alex como un

---

[191] TPO, p 465, líneas 23-26.
[192] Íd., desde la línea 23 a la pág. 466, línea 4.
[193] TPO, p 466, líneas 16-44.
[194] Íd., de la línea 49 hasta la p. 466, línea 2.
[195] TPO, pág. 467, líneas 7-49.
[196] TPO, pág. 503, líneas 4-52.
[197] TPO, pág. 505, línea 1 hasta la pág. 506, línea 39.

paciente que presentó múltiples impactos de bala. En la cara, mano derecha y extremidad inferior izquierda.[198] Identificó el expediente médico de Alex.[199] Luego describió las heridas de Alex y los medicamentos que se le administraron, además de las consultas a otras especialidades médicas como cirugía maxilofacial y ortopedia.[200] Narró los hallazgos del cirujano maxilofacial y de radiología. Indicó que Alex fue dado de alta de 10 de enero de 2020.[201]

En cuanto a los medicamentos para el dolor que se le administraron a Alex Ramos expresó que al ser dosis muy pequeñas no causaban desorientación.[202] Se le administró un sedante "Verset" que tiene seis (6) horas de duración.[203] En el re-directo, el doctor indicó que Alex, aunque herido, podía comunicarse.[204]

Por otro lado, el Agte. Héctor Quiñones Pizarro (agente Quiñones Pizarro) relató que al terminar sus labores fue a la Comandancia de Carolina a llevar la evidencia recopilada y ampliar la información que había recibido sobre "...un tal Carlos".[205] Explicó que dicha información le fue provista por el sargento Torres, supervisor de la División de Homicidios, quien le indicó que estaba en Centro Médico y había entrevistado a Alex.[206] Se enteró de que había un herido cuando llegó a la escena, la agente Figueroa Díaz le dijo que había un herido que fue llevado en ambulancia al hospital.[207] El agente Quiñones Pizarro expresó que el sargento Torres le indicó lo declarado por el menor en cuanto a que Carlos fue el responsable por las muertes de sus familiares, y que la información provista era que Carlos vivía en una casa blanca y gris

---

[198] TPO, pág. 612 líneas 42-45.
[199] TPO, pág. 614 líneas 40-52.
[200] TPO, págs. 615-617.
[201] TPO, pág. 619, líneas 41-43.
[202] TPO, pág. 643, línea 47 hasta la pág. 626, línea 1.
[203] TPO pág. 627, líneas 14-25.
[204] TPO pág. 629, líneas 13-18.
[205] TPO, pág. 1159, líneas 1-12.
[206] Íd., líneas 14-24.
[207] Íd., líneas 27-33.

como un castillo, que Alex lo conocía de toda la vida y que su papá trabajó con este.[208]  Declaró que desde el día de uno tenía como sospechoso del crimen al Imputado y lo identificó en sala.[209]

El agente Quiñones Pizarro consignó que el 3 de enero de 2020 fue a Centro Médico a entrevistar al joven Alex Ramos Wickline.[210] Relató para récord los hechos y la descripción física de Carlos, según provistos por Alex Ramos Wickline.[211]  Luego, el 6 de enero de 2020, acudió a Centro Médico con el Ministerio Público y una taquígrafa para tomarle una declaración jurada a Alex.[212]  Al día siguiente presentaron cargos en ausencia en contra del Imputado.[213]

En el contrainterrogatorio, el agente Quiñones Pizarro admitió que, al entrevistar al hermano de Alex, John Paul, este le dijo el nombre de dos posibles autores del crimen.[214]  Uno de los nombres que le proveyó fue Wilfredo Rivera, a quien el agente Quiñones Pizarro no pudo localizar para entrevistarlo.[215]  También reconoció que no se examinó el contenido de los celulares de los fallecidos, ni se recopilaron huellas dactilares o material genético en la escena.[216] Durante el redirecto, reiteró que Alex indicó que quien cometió los hechos fue el Imputado.[217] **Explicó que no se hizo una rueda de detenidos porque Alex conocía al Imputado de toda la vida**.[218]

Una vez concluido el desfile de prueba, las partes ofrecieron sus informes finales y el TPI pronunció las correspondientes instrucciones al jurado.

El jurado emitió un veredicto unánime de culpabilidad por los once (11) cargos que se le imputaron al Apelante.

---

[208] Íd., líneas 38-46.
[209] TPO, pág. 1160, líneas 30-46.
[210] TPO, pág. 1166, líneas 21-27.
[211] TPO, de la pág. 1167, línea 29 hasta la pág. 1171, línea 27.
[212] TPO, pág. 1173, líneas 5-49.
[213] TPO, pág. 1174, líneas 17-25.
[214] TPO, pág. 1220, líneas 5-18.
[215] TPO, pág. 1223, líneas 18-33.
[216] TPO, pág. 1290, líneas 24-48 y págs. 1291-1294.
[217] TPO, pág. 1362, líneas 41-51.
[218] TPO, pág. 1363, líneas 1-14.

De conformidad con lo anterior, el 29 de enero de 2024, el TPI dictó una Sentencia mediante la cual le impuso al Apelante cuatro (4) condenas de noventa y nueve (99) años cada una, por los cargos de asesinato, y veinte (20) años por el cargo de tentativa de asesinato, a ser cumplidas de manera concurrentes entre sí para un total de noventa y nueve (99) años de reclusión. Además, al Apelante se le impuso una condena de veinte (20) años por infracción al Artículo 6.05 de la Ley de Armas, y cinco (5) condenas de diez (10) años por infracción al Artículo 6.14(a) de la Ley de Armas, a ser cumplidas todas consecutivas entre sí para un total de setenta (70) años de cárcel, y consecutivas con las penas por infracción al Código Penal, para un total de 169 años de reclusión.

El 1 de febrero, el Ministerio Público instó una *Moción de Reconsideración y/o (sic) Corrección de Sentencia* (la "Moción"). En síntesis, planteó que el TPI se equivocó al no imponerle una pena agregada de veinte por ciento (20%) por cada una de las tres víctimas fallecidas restantes, de conformidad con el Artículo 71(b)(2) del Código Civil, 33 LPRA sec. 5104.

Oportunamente, el Apelante se opuso a la Moción; sostuvo que la imposición de la pena agregada que establece el Artículo 7(b)(2) del Código Penal, *supra*, era discrecional y no mandatoria. Por lo tanto, afirmó que la pena de reclusión impuesta estaba correcta y era válida en derecho.

El 21 de febrero de 2024, notificada el 22 de febrero de 2024, el TPI dictó una *Resolución* en la que denegó la Moción. El TPI razonó que era discrecional imponer agravantes, como consideró lo eran los porcentajes dispuestos en el Artículo 7(b)(2) del Código Penal, *supra*. Añadió que el subinciso (1) del propio Artículo 7(b) del Código Penal establece que, cuando uno de los delitos conlleve una pena de reclusión de noventa y nueve (99) años, absorbe las otras penas.

Por su parte, el 27 de febrero de 2024, el Imputado presentó el recurso de apelación que nos ocupa (KLAN202400186).

Mientras tanto, el 25 de marzo (lunes), el Procurador General interpuso el recurso de *certiorari* que nos ocupa (KLCE202400350); formuló el siguiente señalamiento de error:

> El Tribunal de Primera Instancia erró al negarse a cumplir el mandato expreso de la ley y rehusarse a imponer al Sr. José Carlos Aponte Ramos la pena agregada mandatoria del veinte por ciento por cada víctima adicional, en contravención de lo dispuesto en el Artículo 71(b)(2) del Código Penal de Puerto Rico de 2012.

El 10 de abril ordenamos la consolidación de los recursos de referencia. A pesar de haberle ordenado en varias ocasiones al Apelante que debía mostrar causa por la cual no debíamos expedir el auto solicitado por el Procurador General y, así, modificar la sentencia impuesta según solicitado por el Ministerio Público, el Imputado optó por no presentar alegato alguno al respecto. En cuanto a la apelación, contando con la transcripción de la prueba oral y los alegatos de las partes en cuanto al recurso de apelación, resolvemos.[219]

## II.

"Evidencia pertinente es aquella que tiende a hacer la existencia de un hecho, que tiene consecuencias para la adjudicación de la acción, más probable o menos probable de lo que sería sin tal evidencia". Regla 401 de Evidencia, 32 LPRA Ap. VI, R. 401. Es decir, es la evidencia "que arroja luz o tiene algún valor probatorio, por mínimo que sea, para adjudicar la acción". La pertinencia está vinculada al derecho sustantivo aplicable al caso. A tenor con lo anterior, la evidencia pertinente es admisible excepto cuando se disponga lo contrario por imperativo constitucional, por

---

[219] El Apelante no cumplió con nuestras órdenes de mostrar causa por la cual no debíamos expedir el auto de *certiorari* solicitado y revocar la decisión recurrida a través del KLCE20400350. Por dicha razón, resolvemos sin el beneficio de su comparecencia.

disposición de ley o por las Reglas de Evidencia. Regla 402 de Evidencia, 32 LPRA Ap. VI, R. 402; E.L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, 1era Ed., San Juan, Ediciones SITUM, 2016, págs. 71-73.

Por su parte, a diferencia de otras reglas de exclusión de evidencia, la Regla 403 de Evidencia, 32 LPRA Ap. VI, R. 403, permite que el tribunal pueda excluir evidencia pertinente cuando su valor probatorio quede sustancialmente superado por alguno de los siguientes factores:

> Evidencia pertinente puede ser excluida cuando su valor probatorio queda sustancialmente superado por cualesquiera de estos factores:
> (a) riesgo de causar perjuicio indebido
> (b) riesgo de causar confusión
> (c) riesgo de causar desorientación del Jurado
> (d) dilación indebida de los procedimientos
> (e) innecesaria presentación de prueba acumulativa

Así pues, por medio de la Regla 403, *supra*, el tribunal puede descartar evidencia pertinente, aun si no aplicase alguna regla de exclusión. La Regla 403, *supra*, debe ser utilizada con prudencia y cuidado por los tribunales porque el principio fundamental es que toda la evidencia pertinente es admisible, salvo que aplique una regla de exclusión. *Pueblo v. Serrano Morales*, 201 DPR 454, 465-466 (2018). Debe considerarse si el perjuicio que pueda causar la prueba sería mayor al beneficio que se obtendría.

Al interpretar la anterior Regla 19 de Evidencia, (actual Regla 403), en *Pueblo v. Ortiz Pérez*, 123 DPR 216, 228 (1989), se explicó que:

> Por supuesto, toda prueba es "perjudicial" en la medida que favorece a una parte y perjudica a otra, pero este no es el tipo de perjuicio al que se refiere la regla. En términos generales se trata de prueba que puede conducir a un resultado erróneo cuando se apela meramente -y aunque no únicamente- a los sentimientos y a la emoción. (Cita en el original omitida). Hay que recordar, sin embargo, que particularmente en la litigación criminal en ocasiones es preciso recrear ante los ojos del jurado situaciones desagradables que deben ser legítimamente objeto de

prueba. No toda evidencia que pueda conmover el ánimo del jurado constituye materia a ser excluida.

Al respecto, el profesor Chiesa Aponte también ha expuesto lo siguiente:

> Una parte ofrece evidencia que tiende a causar perjuicio -no beneficio- a la otra parte. Una objeción en término de que se excluya la evidencia por su efecto perjudicial no tiene mucho sentido; la otra parte puede contestar que justamente la ofrece para perjudicar o refutar las alegaciones de quien objeta. **Perjuicio indebido se refiere más bien a evidencia cuyo valor objetivo es mucho menor al que puede recibir por parte del juzgador en virtud de factores, por ejemplo, emocionales**. *Pueblo v. Nazario*, 138 DPR 760, 779 (1995). E.L. Chiesa Aponte, *Tratado de Derecho Probatorio; Reglas de Evidencia de Puerto Rico y Federales*, San Juan, Pubs. J.T.S., 1998, Tomo I, pág., pág. 11 (Énfasis nuestro).

III.

Una de las etapas más esenciales o críticas en el procedimiento criminal es la identificación del acusado. No puede haber una condena sin prueba que "conecte" o "señale" al imputado de delito, fuera de duda razonable, como el responsable de los hechos delictivos que se le imputan. *Pueblo v. Hernández González*, 175 DPR 274, 289 (2009). Para que la persona acusada de la comisión de un crimen pueda tener un juicio justo e imparcial, el Estado debe garantizarle que su identificación como autor del delito imputado es confiable y legítima, tal como lo exige el Artículo II, Sección 11, de la Constitución del Estado Libre Asociado de Puerto Rico. Véase, por ejemplo, *Pueblo v. Gómez Incera*, 97 DPR 249, 252 (1969), seguido en *Pueblo v. Rodríguez Maysonet*, 119 DPR 302, 309 (1987). Incluso, la falta de una identificación confiable constituye una violación al debido proceso de ley del acusado. *Pueblo v. Hernández González, supra*.

El Estado puede utilizar varias formas para identificar a los sospechosos de la comisión del acto delictivo investigado. *Pueblo v. Ramos Álvarez*, 122 DPR 287, 310 (1988). En virtud de ello, en aquellos casos en que la víctima o el testigo del delito imputado no

conozca al sospechoso, el procedimiento más aconsejable para su correcta identificación lo es una rueda de detenidos, según lo dispuesto en la Regla 252.1 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 252.1.   Sin embargo, si el testigo conoce al sospechoso "**las salvaguardas contra la sugestividad tales como la rueda de detenidos y los requisitos establecidos en la Regla 252 de Procedimiento Criminal se reducen a un mínimo o, dependiendo de las circunstancias, son inaplicables e innecesarios**".  *Pueblo v. Mattei Torres,* 121 DPR 600, 608 (1988) (Énfasis suplido).

Además, el mero hecho de que no se celebre dicho procedimiento, por haberse efectuado la correspondiente identificación mediante métodos alternos, no tiene el efecto automático de anular el mismo.  *Pueblo v. Robledo,* 127 DPR 964, 968 (1991); *Pueblo v. De Jesús Rivera,* 113 DPR 817 (1983).   Lo anterior, debido a que la persona que conoce al sospechoso puede identificarlo, sin necesidad de intervención de funcionarios del Estado.  Por el contrario, la identificación de un sospechoso por la victima o un testigo es probablemente "...la identificación más espontánea y confiable que pueda darse".   *Pueblo v. Rodríguez Maysonet,* 119 DPR a la pág. 311.

Así pues, lo decisivo para determinar la validez de una identificación "no es el método utilizado en la identificación, sino que sea libre, espontánea y confiable".   *Pueblo v. Ramos y Álvarez,* 122 DPR 287, 312 (1988).   Una identificación eficaz es aquella que goza de suficiente garantía de confiabilidad, criterio sujeto a las circunstancias particulares que concurran en el caso de que trate.  *Pueblo v. Hernández González,* 175 DPR a la pág. 293; *Pueblo v. Mejías,* 160 DPR 86, 93 (2003); *Pueblo v. Torres Rivera,* 137 DPR 630, 637 (1994).   Es por esta razón que una identificación extrajudicial puede estar revestida de legalidad y es igualmente

válida, si la misma cumple con la limitación impuesta por la norma. *Pueblo v. Rodríguez Román*, 128 DPR 121, 128 (1991).

Para evaluar la confiabilidad de una identificación y, por ende, la admisibilidad de la misma, se deberán examinar los siguientes criterios: 1) oportunidad del testigo de observar al acusado en el momento en que ocurre el acto delictivo; 2) grado de atención del testigo; 3) corrección en la descripción; 4) nivel de certeza en la descripción en la identificación y; 5) el tiempo transcurrido entre el crimen y la confrontación. *Pueblo v. Hernández González¸ supra*; *Pueblo v. Mejías, supra*; *Pueblo v. Rodríguez Román, supra*; *Pueblo v. Rodríguez Maysonet*, 119 DPR a las págs. 309-310. En esta labor, el juzgador de hechos está llamado a determinar si la prueba sometida demuestra el grado de confiabilidad exigido, o si la misma presenta una identificación afectada por alguna conducta sugestiva que viole los derechos sustanciales del acusado. *Pueblo v. Torres Ramos*, 121 DPR 747, 751-752 (1988); *Pueblo v. Peterson Pietersz*, 107 DPR 172, 183-184 (1978). Por otro lado, y cónsono con lo anterior, debemos resaltar que **es suficiente la evidencia directa de un testigo que le merezca entero crédito al adjudicador para probar cualquier hecho**, salvo que por ley se disponga otra cosa. Regla 110 de Evidencia, 32 LPRA Ap. IV, R. 110.

Si la identificación del sospechoso ha sido confiable y, al efectuarse, no hubo irregularidades que afecten irremediablemente los derechos sustanciales del imputado, la misma es válida; de lo contrario sería nula. *Pueblo v. Torres Rivera, supra*; *Pueblo v. Rodríguez Román*, 128 DPR a las págs. 127-128; *Pueblo v. Peterson Pietersz, supra*; *Pueblo v. Gómez Incera, supra*. La conclusión del juzgador de los hechos sobre este punto tiene todo el respeto y validez que en apelación se extiende a las determinaciones de hecho. *Pueblo v. Suárez Sánchez*, 103 DPR 10, 19, 21-22 (1974); *Pueblo v.*

*Peterson Pietersz, supra*; *Pueblo v. De Jesús Rivera,* 113 DPR 817, 824 (1983).

IV.

El Artículo II, Sección 7, de la Constitución de Puerto Rico prohíbe que cualquier persona sea privada de su libertad o propiedad sin un debido proceso de ley.  Const. de P.R., Art. II, Sec. 7, LPRA, T. I.  El concepto del debido proceso de ley se manifiesta en dos vertientes distintas: la sustantiva y la procesal.  La vertiente procesal se centra en garantizar un procedimiento justo y equitativo ante acciones estatales que interfieran con intereses privados. *Garriga Villanueva v. Mun. de San Juan,* 176 DPR 182, 196 (2009).

En el ámbito del procedimiento criminal, el debido proceso de ley protege al imputado o acusado de delito "contra confesiones obtenidas mediante coacción y contra procedimientos sugestivos de identificación.  La protección es un arma ofensiva y defensiva; impide al Estado ciertos métodos de investigación y procesamiento, y también proporciona al acusado armas ofensivas, como el derecho a cierto descubrimiento de prueba y a presentar cierta evidencia".  Ernesto L. Chiesa Aponte, II *Derecho Procesal Penal de Puerto Rico y Estados Unidos* 2 (Forum 1995).  En términos generales, se infringe el debido proceso de ley cuando un procedimiento criminal no es fundamentalmente justo, de forma tal que despoja al acusado de un juicio imparcial y justiciero.

El debido proceso de ley también incluye la conducta y manifestaciones del Ministerio Público durante el juicio.[220]  Por ende, el Ministerio Fiscal puede desplegar conducta impropia en infracción al debido proceso de ley del acusado.  En *Berger v. U.S.,* 295 US 78 (1935), se indicó que un incidente aislado de conducta

---

[220] La conducta del Ministerio Público también puede constituir una infracción a una protección constitucional más específica.  Por ejemplo, cuando se alude al silencio del acusado, en contravención del derecho contra la autoincriminación de la Enmienda V de la Constitución federal.  Véase, *Griffin v. California,* 380 U.S. 609 (1965).

impropia del Ministerio Público no es causa de revocación cuando el caso descansa en prueba tan robusta y convincente que, aun sin las manifestaciones del Ministerio Público, el veredicto sería el mismo. Íd. Examinado los hechos del caso, en ese caso se concluyó que la conducta impropia, **pronunciada y persistente,** del Ministerio Público conllevó un probable efecto acumulativo ("probable cumulative effect") sobre el jurado, que no podía ser catalogado como inconsecuente y, por ende, no podía ser ignorada. Íd., a la pág. 89. Esta situación ameritó la celebración de un nuevo juicio.

Por su parte, en *Darden v. Wainwright*, 477 US 168 (1986), el se enfatizó que para que proceda un nuevo juicio a raíz de unas manifestaciones del Ministerio Público, se debe demostrar, no sólo que las mismas fueron erróneas, indeseables o repudiables, sino que estas contaminaron al jurado de tal manera que la condena resultante violó el debido proceso de ley.[221]

Esta norma fue recientemente reiterada en *Andrew v. White*, 604 U.S. ___ (2025). En el contexto de una petición de *habeas corpu0*, se impugnó una condena estatal sobre la base de que el Ministerio Publico había presentado prueba irrelevante sobre la vida sexual y los fracasos como madre y esposa de la acusada. El Tribunal Supremo federal reiteró que, en los casos de juicio por jurado, las manifestaciones perjudiciales o engañosas del Ministerio Público violan el debido proceso de ley **si hacen que un juicio criminal (o un proceso de sentencia de pena capital) sea fundamentalmente injusto**.[222]

---

[221] "It is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process." Íd., págs. 180-181.

[222] "The Court had several times before held that prosecutors' prejudicial or misleading statements violate due process if they render a trial or capital sentencing fundamentally unfair." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Caldwell v. Mississippi*, 472 U.S. 320, 338–340, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Darden*, 477 U.S. at 178–183, 106 S.Ct. 2464.

Por su parte, nuestro Tribunal Supremo ha expresado que, para determinar si cierta conducta impropia del Ministerio Público (prosecutorial misconduct) afectó sustancialmente el fallo o la sentencia, se debe analizar si la conducta ocasionó perjuicio a los derechos sustanciales del acusado. *Pueblo v. Fournier*, 80 DPR 390, 408-409 (1958). Además, el efecto perjudicial que pueda causar la conducta impropia del Ministerio Público al acusado puede ser subsanado a través de una advertencia o instrucción del juez al jurado. Íd.

En cuanto al requerimiento de examinar si la conducta impropia tuvo un efecto en el veredicto del jurado, se debe sopesar las expresiones o actuaciones indebidas contra la prueba que presentó el Ministerio Público, toda vez que la doctrina aceptada es que conductas impropias aisladas del fiscal no son causa de revocación cuando el caso del Estado descansa en prueba tan robusta y convincente que, aun sin dichas conductas, el veredicto hubiera sido el mismo. *Pueblo v. Cotto Torres*, 88 DPR 23, 34-35 (1963); *Pueblo v. Ojeda*, 66 DPR 419, 421-422 (1946).

V.

Por otra parte, los informes finales al jurado están reglamentados por la Regla 136 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 136. Allí se establece que, una vez "[t]erminada la prueba, las partes harán sus informes comenzando con el del fiscal, quien podrá además cerrar brevemente el debate, limitándose a rectificar el informe del acusado. El tribunal podrá en el ejercicio de su sana discreción limitar la duración y el número de los informes".

En *Pueblo v. Fournier*, 80 DPR a la pág. 407, se explicó que el propósito de los informes finales es llamar la atención al jurado a aquellas inferencias que puedan derivarse de la evidencia. En cuanto al contenido de los informes, tanto el fiscal como la defensa

pueden comentar sobre la evidencia presentada y tienen amplia libertad para elaborar conclusiones, inferencias, deducciones y argumentos que se deriven de ella, aun cuando "sean improbables, ilógicos, erróneos o absurdos siempre y cuando hayan sido derivadas de la evidencia desfilada". Íd.; *Pueblo v. González Colón*, 110 DPR 812, 819 (1981).

Lo que no se permite es hacer referencia a prueba que no fue admitida en el juicio. *Fournier*, 80 DPR a la pág. 408. No obstante, el requisito de que exista base en la prueba se interpreta muy liberalmente. *Pueblo v. Suárez Fernández*, 116 DPR 842, 851 (1986). Esto se debe a que la determinación de un jurado sobre las cuestiones de hecho exige inferencias que se deben derivar de la evidencia presentada. *Fournier*, 80 DPR a las págs. 407.408. Por consiguiente, las partes utilizan sus informes finales para llamar la atención del jurado a dichas inferencias. Íd.

Ahora bien, aun cuando las manifestaciones del fiscal o de la defensa se deriven de la prueba admitida en el juicio, no todo argumento es lícito. Íd.; *González Colón*, 110 DPR a la pág. 819. Se reconocen los siguientes límites a lo que puede ser un argumento lícito:

> [N]o se debe inflamar o excitar las pasiones o prejuicios del jurado[:] (1) haciendo referencia a evidencia inadmisible; o (2) urgiéndole que haga inferencias sin base en la prueba admitida; o (3) pidiéndole que descarte la evidencia admitida y que funde su veredicto en consideraciones irrelevantes; o (4) pidiéndole que no pese la evidencia como prescribe la ley; o (5) invocando prejuicios raciales o económicos en contra del acusado; o (6) haciendo referencia al hecho de que el acusado se negó a testificar. Por otro lado, las frases y expresiones que se usan en el argumento pueden en casos extremos constituir conducta impropia. Naturalmente pocos veredictos podrían sostenerse si el tribunal de apelación no hiciera concesiones al ardor y a la excitación que caracterizan el juicio. **De ordinario no se considera impropio apelar a la simpatía del jurado basándose en la evidencia presentada. Los vuelos de elocuencia, de retórica y de patetismo en los discursos del fiscal y de la defensa son lícitos siempre que no rebasen ciertos límites. Tanto el representante del [Estado] como el abogado de la**

**defensa pueden usar imágenes oratóricas (sic), literarias o poéticas y hasta ciertas vituperaciones e invectivas no constituyen necesariamente conducta impropia.** Pero esa libertad muy amplia del argumento no puede degenerar en conducta abusiva. Todo depende de los hechos del caso específico. Fournier, 80 DPR a las págs. 408-409. (Énfasis suplido).

Igualmente, se enfatizó la discreción amplia que tiene el foro sentenciador, pues el juez o la jueza "conoce la atmósfera del juicio, oye el énfasis del comentario, aprecia la susceptibilidad de los jurados y el grado de atención que le prestan a esta o a aquella parte del argumento". Fournier, 80 DPR a la pág. 408.

En cuanto al estándar de revisión de un foro apelativo, el primer paso es determinar si el fiscal hizo manifestaciones impropias en su argumentación final. Sin embargo, esa determinación, de por sí, no amerita la revocación, a menos que se pruebe que tales manifestaciones "ocasionaron un perjuicio a los derechos sustanciales del acusado, es decir, que el veredicto fue influenciado por esa conducta impropia". Íd., a las págs. 408-409. Además, debe auscultarse si el juez que presidió el juicio instruyó al jurado a no tomar en consideración las manifestaciones impropias del fiscal. Dicha instrucción "generalmente subsana cualquier error, salvo en casos excepcionales que nada podría borrar los efectos perjudiciales contra el acusado. A este respecto igualmente todo depende de las cuestiones envueltas, de las partes y de la atmósfera del juicio". Íd., a la pág. 409. Por consiguiente, a pesar de la norma de deferencia que se le confiere al foro sentenciador, un foro apelativo podrá descartarla si determina que el foro de primera instancia abusó de su discreción.

VI.

En cuanto a la determinación de culpabilidad, la misma es revisable en apelación, pues la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y de derecho. *Pueblo v. Cabán Torres*, 117 DPR 645, 653 (1986). No obstante, al evaluar la

prueba presentada ante el juzgador de los hechos, los tribunales apelativos deben reconocer la inigualable posición en que están los foros de primera instancia. Íd., a las págs. 653-654. Es ese juzgador del foro primario quien observa el comportamiento de los testigos al momento de declarar y, sobre la base de ello, adjudica su credibilidad. *SLG Rivera Carrasquillo v. AAA*, 177 DPR 345, 357 (2009). En casos criminales con derecho a juicio por jurado, esta función le corresponde al jurado, el cual está constitucionalmente encomendado a recibir la prueba, adjudicar los hechos sobre la base de esta y aplicar el derecho, según le instruya el tribunal. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 908-909 (2024) citando a *Pueblo v. Santa Vélez*, 177 DPR 61, 65-66 (2009); *Pueblo v. Negrón Ayala*, 171 DPR 406, 414 (2007).

En este contexto, y en cuanto a la apreciación de la prueba, no nos corresponde determinar, a base de nuestra propia apreciación independiente de la prueba, si hubiésemos declarado culpable al imputado por entender que se demostró su culpabilidad más allá de duda razonable. En vez, nuestra función en este contexto se circunscribe, propiamente, a determinar si el juzgador de hechos, con la prueba que tenía ante sí, podía razonablemente concluir que el acusado era culpable, más allá de duda razonable, de los delitos imputados. Const. ELA, Artículo II, Sec. 11, 1 LPRA; Regla 110 de las de Procedimiento Criminal, *supra*; véanse *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991); véase también, *Jackson v. Virginia*, 443 U.S. 307, 317 (1979) (en apelación, solo procede revocar por insuficiencia de prueba cuando "no rational trier of fact could find guilt beyond a reasonable doubt").

En resumen, la apreciación de la prueba por el juzgador de los hechos es merecedora de una gran deferencia por parte del tribunal apelativo. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 259 (2011). Por ello, en "ausencia de pasión, prejuicio, parcialidad o

error manifiesto, y a menos que la apreciación de la prueba se aleje de la realidad fáctica o la prueba sea inherentemente imposible o increíble", debemos, como foro apelativo, abstenernos de intervenir con la misma. Íd.; *Maisonave Rodríguez*, 129 DPR a la pág. 63.

VII.

De otro lado, la norma, de naturaleza constitucional, es que "[n]adie será obligado a incriminarse mediante su propio testimonio y el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra." Const. ELA, Artículo II, Sec. 11, 1 LPRA. Véase, además, Emda. V, Const. EE. UU., LPRA, Tomo I; *Pueblo v. Viruet Camacho*, 173 DPR 563, 570 (2008); *Pueblo v. Sustache Torres*, 168 DPR 350, 353 (2006). Este precepto constitucional tiene su origen en la presunción de inocencia que cobija a todo ciudadano que es acusado de la supuesta comisión de un delito público en nuestra jurisdicción. *Pueblo v. Santiago Lugo*, 134 DPR 623, 629 (1993) citando a *Pueblo v. Esquilín París*, 98 DPR 505, 510 (1970). Por consiguiente, el imputado de delito está protegido por este derecho constitucional a través de todo el proceso criminal. *Esquilín París*, 98 DPR a la pág. 516.

El derecho de un acusado a no declarar, y a que dicha circunstancia no establezca presunción alguna en su contra, no debe ser invadido por el Ministerio Público con comentarios adversos o insinuaciones de clase alguna. Si sucediera esto, el tribunal debe emitir "la más severa e inmediata recriminación por conducta impropia; y el jurado ser instruido por la corte inmediatamente en forma apropiada, de suerte que en el ánimo de los juzgadores de hecho no pueda quedar vestigio alguno de tales comentarios vertidos ante ellos". *Santiago Lugo*, 134 DPR a la pág. 630, citando a *Pueblo v. Díaz*, 69 DPR 621, 629 (1949). Al afrontar una situación donde se alega que se comentó el silencio del acusado, lo verdaderamente determinante es si en efecto se comentó el

silencio del acusado en una forma directa, intensa e inequívoca y si el TPI efectivamente tomó la acción pertinente y procedente para subsanar la situación. *Pueblo v. Santiago Lugo*, 134 DPR a la pág. 633

VIII.

En cuanto a las instrucciones al jurado, estas constituyen "el mecanismo procesal mediante el cual los miembros del jurado toman conocimiento del derecho aplicable al caso". *Pueblo v. Rodríguez Vicente*, 173 DPR 292, 297 (2008), citando a E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Bogotá, Ed. Forum, 1992, Vol. II, pág. 330. Para que el jurado pueda desempeñar dicha función, "los miembros del mismo —que, de ordinario, son completamente legos en la materia— deben ser instruidos adecuadamente sobre el derecho aplicable por el magistrado que preside el proceso". *Pueblo v. Lorio Ormsby I*, 137 DPR 722, 727 (1994), citando a *Pueblo v. Bonilla Ortiz*, 123 DPR 434, 439 (1989). Esto asegura que el desenlace del proceso adversativo esté guiado por el derecho y los hechos. *Rodríguez Vicente*, 173 DPR a las págs. 297-298. Consecuentemente, toda instrucción al jurado deberá ser balanceada, clara, directa y no repetitiva. *Pueblo v. Mattei Torres*, 121 DPR a la pág. 620. Asimismo, "una vez expresado claramente un concepto, su repetición e innecesaria elaboración puede producir confusión en la mente de los oyentes". *Pueblo v. Velázquez Caraballo*, 110 DPR 369, 374 (1980). (Énfasis suplido).

En general, el acusado tiene el derecho a que se informe al jurado de todos los aspectos jurídicos que, según cualquier teoría razonable, pudieran ser pertinentes en las deliberaciones, aunque la prueba de la defensa sea débil, inconsistente o de dudosa credibilidad. *Pueblo v. Negrón Ayala*, ante. Entre los distintos aspectos que deben incluirse en las instrucciones al jurado se encuentran los elementos del delito imputado y, si la prueba así lo

justifica, los elementos de los delitos inferiores al imputado o que estén comprendidos dentro de éste. Además, el tribunal deberá hacer hincapié en que el Ministerio Fiscal tiene la obligación de establecer todos los elementos del delito más allá de duda razonable. *Pueblo v. Rosario*, 160 DPR 592, 604-605 (2003).

La Regla 137 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 137, "impide que se alegue error en instrucciones no objetadas ni solicitadas". *Pueblo v. Velázquez Caraballo*, 110 DPR a la pág. 372. No obstante, "si las instrucciones que efectivamente transmitió el tribunal a los señores del jurado, o aquellas que omitió transmitir, "lesionan derechos fundamentales del acusado", éste en apelación puede levantarlo como error a pesar de no haberlas objetado oportunamente". (Citas omitidas). *Pueblo v. Ortiz Martínez*, 116 DPR 139, 151 (1985).

Si el tribunal no informa al jurado, por medio de las correspondientes instrucciones, sobre los aspectos generales del derecho y de las defensas propuestas por las partes, ello podría conllevar que la condena sea revocada. *Pueblo v. Negrón Ayala*, *supra*. En *Pueblo v. Sáenz Forteza*, 100 DPR 956, 963 (1972), se estableció que la omisión de una instrucción solicitada por la defensa puede conllevar la revocación de la condena si la misma es "correcta, el punto no debe haber sido cubierto en otras instrucciones y lo omitido debe referirse a un punto vital de manera que esa negativa prive al acusado seriamente de una defensa efectiva". Véase, además, *Pueblo v. Negrón Vélez*, 96 DPR 419, 431 (1968). Ante una apelación impugnando las instrucciones impartidas a un Jurado, hay que considerar las instrucciones en conjunto para determinar su corrección o incorrección. *Pueblo v. Doménech Meléndez*, 98 DPR 64, 68 (1969).

Por otro lado, el uso del *Libro de Instrucciones al Jurado* constituye la mejor práctica, ya que le cobija una presunción de

corrección y las instrucciones allí expuestas no pueden ser impugnadas en ausencia de una demostración real de que, en efecto, la instrucción es errónea. *Vélez Caraballo*, 110 DPR a la pág. 374; véase, además, *Pueblo v. Ortiz González*, 111 DPR 408, 413 (1981). Se considera que es una buena práctica que las instrucciones al jurado no sean innecesariamente largas ni repetitivas, sino que se ajusten a la letra de la ley, a las instrucciones contenidas en el referido Manual y que su lenguaje sea claro y directo. *Velázquez Caraballo*, ante.

## IX.

Por otro lado, existen situaciones en las que, mediante uno o más actos, una misma persona puede cometer dos o más ofensas y éstas pueden ser valoradas y juzgadas conjuntamente en el mismo procedimiento judicial. *Pueblo v. DiChristina Rexach*, 204 DPR 779, 790 (2020) citando a L.E. Chiesa Aponte, *Derecho penal sustantivo*, 2da ed., San Juan, Pubs. JTS, 2013, pág. 71; *Pueblo v. Acevedo Maldonado*, 193 DPR 270, 273-274 (2015). Cuando esto sucede, se está ante la figura del concurso de delitos. Esencialmente, esta figura se encarga de cómo debe determinarse "**cuál es la pena que mejor refleja la gravedad del hecho** y la culpabilidad de la persona". *DiChristina Rexach*, ante, citando a Chiesa Aponte, *op. cit.* (Énfasis provisto).

La teoría del concurso de delitos ha desarrollado tres (3) escenarios: el concurso ideal, el concurso medial y el concurso real. El concurso ideal ocurre "cuando un solo hecho o unidad de conducta infringe varios tipos delictivos que tutelan bienes jurídicos distintos". Íd., citando a *Pueblo v. Álvarez Vargas*, 173 DPR 587, 592-593 (2008). En este caso, se acusa al imputado por más de un delito, aunque se le sancione con la pena del delito más grave, toda vez que las diversas infracciones son producto de una misma conducta. Íd.

El segundo escenario, el concurso medial de delitos, se configura cuando "una persona comete más de un delito, pero todas las circunstancias apuntan a que uno de los delitos fue el medio necesario para cometer el otro". Íd. A pesar de que existe una multiplicidad de hechos, estos casos se atienden según las normas del concurso ideal de delitos. Íd., citando a *Pueblo v. Álvarez Vargas, supra*; *Pueblo v. Calderón Álvarez,* 140 DPR 627, 646 (1996); *Pueblo v. Meléndez Cartagena,* 106 DPR 338, 348 (1977).

El tercer supuesto del concurso de delitos es el concurso real. Este "contempla aquellas situaciones en las que varias unidades de conducta violan la misma ley o normas penales distintas". *Álvarez Vargas,* 173 DPR a la pág. 594. (Cita omitida). Es decir, aplica en "aquellas instancias en que existen varios actos y varios delitos". *DiChristina Rexach, supra,* citando a Chiesa Aponte, *op. cit.*, pág. 72.

El concurso real de delitos está reglamentado por el Artículo 71 del Código Penal de 2012, *supra,* del siguiente modo:

Artículo 71. Concurso de delitos

(a) [...]
(b) Concurso real de delitos: Cuando alguien haya realizado varios delitos que sean juzgados simultáneamente, cada uno de los cuales conlleva su propia pena, se le sentenciará a una pena agregada, que se determinará como sigue:
   (1) Cuando uno de los delitos conlleve pena de reclusión de noventa y nueve (99) años, ésta absorberá las demás.
   (2) **Cuando <u>más de uno de los delitos</u> conlleve reclusión por noventa y nueve (99) años, <u>se impondrá</u>** además **una pena agregada del veinte (20) por ciento por cada víctima**.
   (3) En los demás casos, se impondrá una pena para cada delito y se sumarán, no pudiendo exceder la pena agregada del veinte (20) por ciento de la pena para el delito más grave. (Énfasis y subrayado provistos).

El precitado artículo establece claramente el método para imponer las penas en casos en donde se configura el concurso real de delitos. De acuerdo con el subinciso (b)(2) del artículo en discusión, cuando más de uno de los delitos acarree una pena de noventa y nueve (99) años, se impone una pena de noventa y nueve

años (99) **y se le suma un veinte porciento (20%) por cada víctima adicional**. En lugar de imponer la totalidad de cada una de las penas, estas se atenúan al imponer únicamente un veinte porciento (20%) adicional por cada una de las otras víctimas.

X.

Consideramos inicialmente el recurso de apelación presentado por el Imputado. Examinado el expediente de autos, junto a la transcripción de la prueba oral, concluimos que procede la confirmación del fallo de culpabilidad emitido por el jurado.

Como cuestión de derecho, era claramente admisible y válida la identificación del Imputado por Alex. No existe apoyo alguno en el récord para la teoría de que hubo algún tipo de sugestividad, o algún otro vicio que podría afectar la admisibilidad de su testimonio sobre identificación del Imputado.

Más aún, sobre la base de dicho testimonio, el jurado podía razonablemente concluir que, en efecto, fue el Imputado quien Alex observó disparándole a él, a sus padres y a sus hermanos. Alex declaró de forma categórica que, desde que escuchó la voz del Imputado, aun antes de salir de su cuarto, la reconoció, pues lo conocía hace tiempo por visitar su casa con frecuencia. Además, declaró que lo vio, primero disparando hacia sus familiares, y luego cuando le disparó a él, y que lo había reconocido al verlo, pues lo conocía. En efecto, Alex tuvo oportunidad de ver al Apelante afuera de su casa cuando se asomó desde la puerta y nuevamente cuando este se le acercó para dispararle.

En fin, Alex explicó que reconoció la voz del Apelante porque lo **conoce de toda la vida**; que pudo verle la cara; que este vive cerca de la casa de su abuela; que él visitaba la residencia del Apelante para jugar con una videoconsola con el hijo de este; le ayudaba a darle comida y agua a los gallos; y que su fenecido padre

trabajó con el Apelante. Además, aclaró **que conoce al Apelante como Carlos, pero que su nombre completo es José Carlos**.

Lo declarado por Alex en el juicio es compatible con, y fue corroborado por, lo manifestado por Alex antes del juicio. Es decir, otros testigos confirmaron que Alex, desde que pudo hablar en Centro Médico, el mismo día de los hechos, siempre dijo que el Apelante fue el autor. Otros testimonios corroboran las declaraciones que hizo Alex en corte abierta en cuanto a que conoce al Apelante de toda la vida; que este era un vecino de la comunidad y su padre trabajó con él; la descripción de la residencia del Apelante; que Alex pidió ayuda cuando escuchó a sus familiares afuera de la residencia; el lugar de la residencia donde fue encontrado herido; la visibilidad e iluminación del área en horas de la madrugada; el nombre, Carlos, por el que se le conoce al Apelante; y que este vivía cerca de la casa de la abuela de Alex.

Cabe enfatizar que, contrario a lo aseverado por el Apelante, la necesidad de utilizar métodos alternos de identificación, como una rueda de detenidos, surge cuando el perjudicado o testigo de la comisión de un delito no conoce personalmente al sospechoso de su comisión.

Contrario a lo que arguye el Apelante, las entrevistas realizadas a Alex por parte de los agentes de la Policía y, subsecuentemente, del Ministerio Público, no fueron sugestivas. En cuanto a la entrevista del 1 de enero de 2020, el sargento Torres Soto, antes de entrevistar a Alex, solicitó autorización del señor Ramos Matos, trabajador social del Departamento de la Familia, para que supliera capacidad, ante el hecho indubitado de que ambos progenitores acababan de fallecer. Asimismo, el señor Ramos Matos estuvo presente en esa primera entrevista en la que Alex identificó inequívocamente a su vecino "Carlos" como el autor de los hechos. Por su parte, el médico de emergencias, doctor Betancourt Ortiz,

declaró que, en ese momento, los analgésicos provistos a Alex no producían desorientación en las dosis administradas. Además, el Departamento de la Familia asumió la custodia de Alex y el señor Ramos Matos también autorizó y suplió capacidad en las subsiguientes entrevistas que se le realizaron a Alex. Así pues, el récord no apoya que mediase sugestividad, mucho menos alguna sugestividad innecesaria e impermisible.

Concluimos que la prueba claramente le permitía al jurado concluir, más allá de duda razonable, que el Imputado cometió los delitos por los cuales se le acusó. Alex tuvo amplia oportunidad de ver al Apelante al momento de los hechos, lo conocía de antemano y su identificación no fue sugestivamente promovida por el Estado. La imprecisión esgrimida por el Apelante en torno a partes del testimonio de Alex como fundamento para impugnar su identificación es un asunto de credibilidad que le correspondía resolver al jurado. La totalidad de la prueba desfilada, creída por el Jurado, sostiene la confiabilidad de la identificación. En ausencia de pasión, prejuicio, parcialidad o error manifiesto, debemos abstenernos de sustituir el criterio del juzgador de los hechos por el nuestro.

Tampoco tiene razón el Imputado al plantear que el TPI permitió la presentación de prueba irrelevante, inflamatoria y "perjudicial". En cuanto a la foto de un fichaje previo del Apelante, lo cierto es que la aludida foto no le fue presentada al jurado. Después de un "*voir dire*", el TPI denegó la presentación de dicha evidencia en el juicio. El Apelante alega que el Ministerio Público puso encima de una mesa la aludida foto de tal manera que un miembro del jurado pudo observarla. Se trata de una especulación del Apelante sin apoyo en el récord; de todas maneras, al recibir las instrucciones, el jurado fue reiteradamente apercibido en cuanto a que únicamente podían tomar en cuenta la evidencia admitida en el

juicio. Aun de haberse demostrado que la foto fue vista por un miembro del jurado, ello no conllevaría la revocación de la condena, pues, a la luz de la totalidad del récord, no puede concluirse que esto haya sido un factor importante, o siquiera incidental, en cuanto a la determinación del jurado.

Asimismo, consideramos que era admisible la llamada al Sistema de Emergencias 911. Aunque no fue presentada para demostrar alguno de los elementos de los delitos imputados o su conexión con el Apelante, la llamada al Sistema 911 sirvió para confirmar la versión de los hechos que dieron varios de los testigos. Además, la regrabación permitió establecer el momento en el que ocurrieron los hechos, el ambiente de emergencia subsiguiente y la premura por salvar la vida del único sobreviviente, Alex. De todas maneras, aun si la llamada se considerase inadmisible, considerada la misma a la luz de la totalidad de la evidencia ante el jurado, concluiríamos que la misma no fue un "factor decisivo o sustancial" en el fallo emitido. Regla 105(A)(2) de las de Evidencia, 32 LPRA Ap. VI, R. 105(A)(2).

Por otro lado, tampoco consideramos que el Ministerio Público haya emitido comentarios impropios. Las alusiones que hizo el Ministerio Público en torno a Dios y al propósito de Alex haber sobrevivido el atentado contra su vida encajan dentro del amplio margen que se le permite a las partes en un informe al jurado.[223] De todas formas, aun de considerarse dichos comentarios como impropios, la prueba del Ministerio Publico es tan contundente que, aun sin dichas expresiones, el veredicto hubiera sido el mismo.

---

[223] El Ministerio Público dijo lo siguiente:
"Una herida como esa, sobrevivir es bien difícil. Y él sobrevivió. Gracias a Dios usamos la creencia de cada cual. Pero gracias a Dios, al Universo. Sobrevivió. Y yo sé que Dios tiene muchos propósitos para su vida. Pero yo le garantizo que uno de esos propósitos fue venir a este Tribunal. Y decirles a ustedes quien mató a su familia. Yo estoy seguro de que eso es uno de los propósitos." TPO, pág. 1559, líneas 4-11.

Asimismo, no hubo error de derecho, o abuso de discreción, en la determinación del TPI de no permitir objeciones durante la etapa de los informes finales. El TPI tiene amplia discreción para regular la etapa de los informes finales y el Apelante no demostró abuso de dicha discreción. Además, el Apelante tuvo oportunidad amplia de presentar su informe y defenderse durante dicha etapa de los procedimientos.

Tampoco tiene razón el Apelante al plantear que el Ministerio Público comentó su silencio. Lo manifestado en cuanto a ignorar la relación entre un tal "Wilfredo Vega" y el Apelante, en cuanto a desconocer los motivos para la comisión de los delitos, que el culpable no se escape, se salga con la suya o que el crimen fue perfecto al pensar su autor que no hubo sobrevivientes, no equivale a comentar el silencio del acusado.

Por su parte, el comentario en cuanto a que el Apelante podía entrevistar y sentar a declarar alguno de los testigos que fueron anunciados y no presentados por el Ministerio Público, y el Apelante no lo hizo ni dijo la razón, no puede tomarse fuera de contexto.[224] El comentario obedece a que la propia defensa del Apelante mencionó que, de 32 testigos anunciados, el Ministerio Público soló sentó 16 a declarar y cuestionó la razón por la cual no declararon los testigos restantes. El Ministerio Público aclaró que no se sentaron todos los testigos porque varios de los testimonios iban dirigidos a establecer la cadena de custodia o identificar documentos que al ser admitidos resultaron ser innecesarios. Fue entonces cuando indicó que dichos testigos no se le escondieron a la defensa y que esta podía usarlos si quería. Por lo tanto, no se hizo alusión al silencio del acusado, sino que se aclaró la razón para no presentar todos los testigos anunciados y la disponibilidad de estos.

---

[224] TPO, pág. 1599, líneas 27-35.

Aun de estimarse como impropias, las manifestaciones del Ministerio Público en el informe final al jurado no conllevarían la revocación del fallo, pues no se demostró que las mismas hubiesen ocasionado perjuicio a los derechos sustanciales del Apelante o que el veredicto fue influenciado por esa conducta impropia. *Pueblo v. Hernández Santiago, supra.* Al contrario, el récord revela que el TPI impartió instrucciones al jurado en torno al silencio del acusado de modo sencillo, preciso y suficiente para evitar que las manifestaciones del Ministerio Público influyeran indebidamente en el jurado.

En cuanto al planteamiento final del Apelante, concluimos que el TPI no estaba obligado a impartir al jurado la instrucción solicitada por el Apelante, proveniente de la Regla 6.03 de las Reglas de Procedimiento Criminal federal (*Reaching Agreement*). La aludida Regla aplica única y exclusivamente en el ámbito de las cortes federales. Además, el récord revela que el TPI fundamentó las instrucciones impartidas al jurado en el *Libro de Instrucciones al Jurado* del Poder Judicial. La mejor práctica es el uso del referido *Libro* debido a que le cobija una presunción de corrección y no puede ser impugnada en ausencia de una demostración real de que, en efecto, la instrucción es errónea. *Pueblo v. Ortiz González, supra.*

En este caso, el TPI reiteró el carácter imparcial, individual y concienzudo del análisis que los miembros del jurado debían realizar. Asimismo, enfatizó que los jurados no tenían que explicar cómo votaron en ningún momento y que no debían dejarse llevar por sentimientos de piedad, simpatía, pasión o perjuicio de no solo la persona acusada, los abogados, fiscales o testigos, sino de cualquier persona que participó en el proceso penal. Con ello se cumplió con la esencia de la instrucción solicitada, la cual de este modo resultaba innecesaria y repetitiva.

Por todo lo anteriormente expuesto, concluimos que procede la confirmación del fallo de culpabilidad, lo cual dispone de la apelación presentada por el Imputado.

XI.

Procedemos a evaluar lo planteado por el Ministerio Público en cuanto a la corrección de la sentencia impuesta.

El Artículo 71(b) del Código Penal, *supra,* dispone que, "cuando **más de uno de los delitos** conlleve reclusión de 99 años, **se impondrá además** una pena agregada del veinte (20) por ciento **por cada víctima**." (Énfasis suplido).

El texto de esta disposición no confiere discreción al TPI para negarse a imponer la "pena agregada". Adviértase que el legislador dispuso que dicha pena "se impondrá". No se dispuso que "podrá imponerse", sino que "se impondrá". Por tanto, el TPI no tenía discreción para desobedecer este mandato de ley. Tampoco hay aquí controversia sobre el hecho de que estamos ante una situación de más de un delito con reclusión de 99 años. De hecho, el Imputado ni siquiera intentó oponerse a lo planteado por el Ministerio Público en su petición, a pesar de que, en múltiples ocasiones, le advertimos que debía consignar su postura al respecto.

En el caso de autos, el Apelante fue juzgado y hallado culpable de cuatro (4) asesinatos: un padre, una madre y dos de los hijos menores de la pareja. Estos asesinatos aparejan cuatro (4) condenas de reclusión de noventa y nueve (99) años. En lugar de imponer dichas cuatro condenas, el Artículo 71(b)(2) del Código Penal, **ordena** que el TPI imponga una de las penas de noventa y nueve (99) años por uno de los asesinatos, más una pena agregada de veinte por ciento (20%) de los primeros noventa y nueve años (99) por cada víctima adicional. Por consiguiente, además de la pena de 99 años por el primer asesinato, el TPI estaba obligado a imponer una pena agregada de 19.8 años de reclusión por cada asesinato

adicional, sumados a los 70 años por las infracciones a la Ley de Armas, para un total de 228.4 años.[225]

Resulta patentemente errónea la "interpretación" del TPI en cuanto a que la imposición de la pena agregada establecida en el Artículo 71 del Código Penal, *ante*, es discrecional, de modo semejante a la consideración de agravantes o atenuantes. Nada en el lenguaje del inciso (b) del precitado artículo siquiera sugiere que sea discrecional la imposición de la pena agregada allí dispuesta. Al enfrentarse el foro sentenciador con el concurso real de delitos, el Artículo 71 del Código Penal, *supra*, establece claramente y sin ambigüedades cómo deben establecerse las penas. Cuando la letra de la ley es clara y libre de toda ambigüedad, su texto debe respetarse, sin necesidad de mirar más allá de su letra. *Báez Rodríguez et al. v. ELA*, 179 DPR 231, 244, 245 (2010).

XII.

Por los fundamentos que anteceden, se confirma el fallo apelado, se expide el auto de *certiorari* solicitado y se revoca la *Resolución* de 21 de febrero de 2024. Se devuelve el caso al TPI para para que emita la correspondiente sentencia enmendada de conformidad con lo aquí resuelto.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[225] 99 años (primer asesinato) + 59.4 años (3 penas agregadas de 19.8) + 70 años (ley de armas). Los veinte años por la tentativa se absorben.